UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARGARET RIVILY,

        Plaintiff,

  v.

U.S. BANK N.A.,

        Defendant.

CASE NO. C05-1183C

ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 17), Plaintiff's Opposition thereto (Dkt. No. 25), and Defendant's Reply (Dkt. No. 27). The Court has considered all of the papers submitted regarding this motion and determined that oral argument is not necessary. The Court hereby GRANTS Defendant's motion for summary judgment as to all claims.

## I.    BACKGROUND AND FACTS

This case involves multiple claims arising out of discrimination Plaintiff allegedly experienced as a result of her hearing impairment during the course of her employment with Defendant's Bear Creek Branch from November 30, 2001 to July 9, 2003. (Pl.'s Decl. 1.)

Plaintiff alleges a hearing impairment that reduced her hearing by 60% in her left ear, and 40% in her right ear. (Pl.'s Decl. 2.) During her 2001 interview, Plaintiff claims to have told Branch Manager

ORDER – 1

Aida Ramos and Teller Supervisor Melinda Moore that she was hearing impaired and wore hearing aids. (Decl. of Rachel E. Byrne in Supp. of Def.'s Mot. for Summ. J., Ex A 16-17 (hereinafter "Rivily Dep.").)[1] Plaintiff "believe[s] that [she] told Aida Ramos and Melinda Moore at the time of the interview that [she] would probably need a sign" to notify people with whom she might interact that she was hearing impaired. (Pl.'s Decl. 2.) Plaintiff was offered the job on the spot at the conclusion of the interview and she accepted the position. (Rivily Dep. 35.)

During the course of her employment, Plaintiff encountered several problems related to her hearing loss for which she sought accommodation. First, Plaintiff claims that she was not provided with any sign indicating that she was hearing impaired that would have prevented customers from misperceiving her as inattentive or rude. (Pl.'s Decl. 2.) Plaintiff claims to have made requests for signs on multiple occasions.[2] (*Id.*) It is undisputed that none of Defendant's employers ever explicitly rejected her request for a sign, forbade her from creating her own, or suggested in any way that she would be sanctioned for doing so. (Rivily Dep. 88.) Nevertheless, Plaintiff did not construct her own sign. She believed that she needed management approval for the wording and did not know what the Bank's policy was regarding the language. (Pl.'s Decl. 3.) Plaintiff alleges that Branch Manager Ramos on at least one occasion made a joke suggesting that the Bank provide her with signs that rhymed. (Pl.'s Decl. 2.) She

---

[1] Page numbers for citations to the Rivily Deposition refer to the original pagination for the unabridged transcript rather than the page in which they appear in Defendant's exhibits.

[2] Like many of Plaintiff's factual allegations in this case, the evidence used to support her assertion that she made multiple requests for signs is extremely conclusory with little factual corroboration. Plaintiff claims that she made such requests on multiple occasions but does not provide concrete recollections of particular instances in which such requests were made. While such bare allegations may not be enough to establish a genuine issue of material fact sufficient to defeat summary judgment, *see e.g.*, *Nat'l Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496 (9th Cir. 1996), the Court need not resolve this issue as Plaintiff would still lose on summary judgment even if such allegations were given full weight.

ORDER – 2

also alleges Manager Ramos repeatedly told Plaintiff that she believed her hearing loss to be selective.[3] (Pl.'s Decl. 2.)

Plaintiff alleges that the lack of a sign caused her several problems. Plaintiff alleges that her ability to communicate effectively with customers was hindered. Additionally, when she was robbed in February of 2002, she had difficulty communicating with the robber, who did not initially know that Plaintiff was hearing impaired. (Pl.'s Decl. 3-4.) She felt that the robber became angry at her during the course of the robbery, as she initially did not understand what he wanted and later could not fully understand his instructions for giving her the Bank's money. This encounter caused her to be very frightened.

Second, Plaintiff alleges that the bank-provided phones were inadequate to meet her hearing needs. Plaintiff claims to have made requests for phones with amplified volume that were not immediately addressed. At some point, Plaintiff bought her own equipment from Radio shack in an attempt to resolve the telephone problem. (Pl.'s Decl. 4.) When management learned that she had used her own money to purchase the Radio Shack phone, it offered to reimburse her for any expenses required to obtain a proper phone. (Rivily Dep. 72.) Plaintiff was unable to get the Radio Shack phone to work properly. (Pl.'s Decl. 4.) While she waited for a phone that would suit her needs, other employees at Defendant's Bank answered phones for her. (Rivily Dep. 81.) Plaintiff admitted that employees were "helpful," that they never refused to assist her, and that she never received any negative comments as a result of her requests for assistance with phone calls while she awaited a suitable phone. (*Id.*) Ultimately, Defendant purchased a phone that suited her needs (Rivily Dep. 84), though this was not until

---

[3] Indicative of Plaintiffs apparent inability to articulate specific facts on point are her comments regarding the frequency of Defendant's employees' accusations of Plaintiff's "selective hearing." Plaintiff writes "[t]he Defendant would have this court believe that this was a one-time occurrence. It was not. It was repeatedly stated to the Plaintiff." (Pl.'s Opp'n 12.) Plaintiff offers no further elaboration on this point. Further, Plaintiff never gives any context regarding the alleged incident in which a manager suggested she get rhyming signs.

ORDER – 3

"shortly before" she resigned (Pl.'s Decl. 4).

Plaintiff received poor work evaluations during the course of her employment. (Pl.'s Decl. 5.) She attributes those negative evaluations to her inability to hear coworkers and customers unless they were speaking directly towards her face so that she could read their lips. (*Id.*) She was criticized for making personal phone calls at work, which consisted of calls to ensure that her children were safely home from school. (*Id.*)

Plaintiff eventually resigned her position on June 25, 2003. (Pl.'s Decl. 1.) At that time, management asked if there was anything they could do to keep her working at the Bank and offered to transfer her to another branch. (Pl.'s Decl. 6; Rivily Dep. 97.) Plaintiff declined the general offer for accommodation and the specific offer to be transferred to another Bank, even though she believed that the Bank would have given her a comparable position at a branch nearby (Rivily Dep. 99).

Plaintiff admits that she never contacted the human resources department at the bank regarding any alleged discrimination or lack of accommodations. (Rivily Dep. 87.) She likewise never complained to the human resources department about any comments made by Ms. Ramos. (Rivily Dep. 113.) Plaintiff also does not dispute that she did not file a complaint with the Equal Employment Opportunity Commission (EEOC).

Plaintiff brought suit in Washington state court, alleging 1) violation of the Americans with Disability Act, 2) discrimination under Washington State Law, 3) wrongful discharge, 4) breach of contract, 5) negligence, and 6) outrage. Defendants properly removed the case to this Court. (*See* Dkt. No. 1.)

## II.   STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure states that a party is entitled to summary judgment in its favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

ORDER – 4

an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact finder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The moving party bears the burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial. *Anderson*, 477 U.S. at 250.

## III. ANALYSIS

### A. AMERICANS WITH DISABILITIES ACT CLAIM

Plaintiff alleged a violation of the Americans With Disabilities Act. A plaintiff must first file a timely EEOC complaint against the allegedly discriminating party before bringing suit in federal court under the Act. *Josephs v. Pacific Bell,* 443 F.3d 1050 (9th Cir. 2006). Plaintiff did not provide evidence that any such complaint was filed and did not even bother to raise the claim in her motion papers once this omission was pointed out by Defense counsel. Accordingly, Plaintiff cannot successfully maintain a cause of action against Defendant under this Act.

### B. DISCRIMINATION IN VIOLATION OF STATE LAW

Plaintiff alleges that Defendant discriminated against her in violation of Chapter 49.60 of the Washington Revised Code. Washington courts have largely adopted the burden-shifting test under *McDonnel Douglas* in analyzing disability discrimination claims. *Hill v. BCTI Income Fund-I*, 23 P.3d 440, 446 (Wash. 2001); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The employee has the burden of establishing a *prima facie* case of unlawful discrimination. Once a plaintiff makes a *prima facie* case, the burden shifts to the employer to present sufficient evidence of legitimate and

ORDER – 5

nondiscriminatory reasons for the discharge.

Ultimately, Plaintiff alleges two different theories under which she has been discriminated. First, she alleges that Defendant failed to reasonably accommodate her disabilities. Second, she alleges she experienced disparate treatment. Each theory will be addressed in turn.

### 1. REASONABLE ACCOMMODATION

To establish a *prima facie case* of a failure to reasonably accommodate, Plaintiff must demonstrate, i) that he or she is disabled, ii) that he or she is qualified for the position, and iii) that the employer failed to reasonably accommodate the disability. *Curtis v. Security Bank of Wash.*, 847 P.2d 507, 510 (Wash. App. Div. 1993). Even under Plaintiff's verison of the facts, her arguments that Defendant did not reasonably accommodate her are unpersuasive.

Plaintiff first argues that Defendant never provided her with any signs to put customers (and potential robbers) on notice regarding her hearing impairments. Plaintiff has not met her burden of demonstrating that such signs were medically necessary. An employer's duty to accommodate "is limited to those steps reasonably necessary to enable the employee to perform his or her job." *Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 934 (Wash. 2004). An employer need only accommodate the disability, it need not approve every request by an employee regarding the form the accommodation should take. *Pulcino v. Federal Express Corp.*, 9 P.3d 787, 795 (Wash. 2000). Here, the only evidence tending to support a need for the signs are Plaintiff's bare assertions that they would be helpful. While Plaintiff's ability to communicate may have been somewhat enhanced through use of a sign informing customers of her hearing loss, such enhancements fall far short of medical necessity.

Plaintiff constantly points out that it would have been exceedingly easy and inexpensive for Defendant to provide her with a small sign. While this is true, it would have been equally easy and inexpensive for Plaintiff herself to construct a sign. No employee at Defendant's corporation ever forbade her from printing out or handwriting a sign, nor did anyone otherwise indicate that she would be punished for engaging in readily available self-help. Though Plaintiff claims she did not construct her

ORDER – 6

own sign because she feared the language had to be preapproved by the Bank, she never once brought this concern to her superiors. Thus, the issue is whether an *employer-provided* sign was reasonably necessary to enable Plaintiff to do her job and Plaintiff provides no justification why the sign had to be manufactured by the employer rather than printed (or even handwritten) by herself.

Plaintiff also argues that Defendant failed to provide her with the proper phone equipment necessary to do her job. However, it is clear that the Defendant made substantial accommodations to assist her in using the telephones. When it became apparent that Plaintiff was purchasing her own equipment from Radio Shack to facilitate her phone usage, Management offered to reimburse her for any expense. (Rivily Dep. 72.) When it became apparent that the Radio Shack equipment was not working, Management had other staff members field her calls. (Rivily Dep. 81.) Plaintiff admits that the employees were "helpful," that nobody ever refused to assist her, and that nobody commented negatively on any requests for assistance. (Rivily Dep. 81.) Ultimately, she received a phone that did accommodate her needs, though she did not receive it until roughly June of 2003. (*See* Rivily Dep. 74; Pl.'s Decl. 1.) Though Defendant may not have always given Plaintiff the precise accommodation she desired at the moment she requested, the employer is only required to accommodate the disability itself rather than any specific accommodation request. *See Pulcino*, 9 P.3d at 795. Defendant's offer to pay for any expenses in obtaining a viable phone, provision of helpful coworker phone assistance, and ultimate purchase of an adequate replacement phone amply accommodated the Plaintiff's disabilities.

Accordingly, reasonable accommodations were made for her disabilities and Plaintiff is thus precluded from making a *prima facie* case under this theory of discrimination.

### 2.    DISPARATE TREATMENT

To establish a *prima facie* case of disparate treatment, Plaintiff must establish that she i) is in a protected class, ii) was discharged (or constructively discharged), iii) was doing satisfactory work, and iv) was replaced by someone not in the protected class. *Haubry v. Snow*, 31 P.3d 1186, 1192 (Wash. App. Div. 2001); *see also Roeber v. Dowty Aerospace Yakima*, 64 P.3d 691, 696 (Wash. App. Div. 2003).

ORDER – 7

Plaintiff does not allege that she was fired from her position. Rather, she claims that she was constructively discharged because employment with Defendant was so intolerable that she was forced to resign.

Constructive discharge occurs when an employer deliberately makes an employee's working conditions "intolerable" and thereby forces him or her to quit. *Bulaich v. AT & T Info. Sys.*, 778 P.2d 1031, 1034-35 (Wash. 1989). Courts use an objective standard to determine whether a reasonable person would find the working conditions intolerable. *Binkley v. City of Tacoma*, 787 P.2d 1366 (Wash. 1990). The employer must have intended to cause the act that created the intolerable condition, though the employer need not have intended that the employee actually resign. *Bulaich*, 778 P.2d at 1035. Courts typically look to either "aggravating circumstances" or a "continuos pattern of discriminatory treatment" to support a constructive discharge claim. *Sneed v. Barna*, 912 P.2d 1035, 1039 (Wash. App. Div. 1996). Whether the working conditions were "intolerable" is generally a factual question for the jury. *Id.* However, if there is no competent evidence to establish a constructive discharge claim, the issue may be determined as a matter of law. *See e.g.*, *id.*; *Washington v. Boeing*, 19 P.3d 1041, 1049 (Wash. App. Div. ,2000).

The facts as alleged by Plaintiff do not support a claim of constructive discharge. First, as indicated earlier, Defendant made reasonable accommodations for Plaintiff regarding her requests for signs and her difficulties in using the phone. The Bank was at worst nonresponsive to her requests. Defendant's failure to act under these circumstances hardly constitute the kind of *deliberate* act required by an employer to create an actionable "intolerable" working environment. *See Bulaich*, 778 P.2d at 1034.

Additionally, Plaintiff's allegations that management treated her poorly by suggesting she get a rhyming sign, and that her hearing was selective likewise did not create an environment in which Plaintiff was forced to resign. In *Boeing*, the court held that a female mechanic's complaints that she was told that she could not do the job as well as a man, called the racially offensive name of "brillo head," and that

ORDER – 8

her coworkers refused to assist her with certain tasks, among other things, did not qualify as constructive discharge. 19 P.3d at 1041. The court concluded that any racially offensive comments or actions were not an "ongoing occurrence," and that "[w]hile the alleged negative remarks about women and a coworker's refusal to assist [the plaintiff] with certain tasks was frustrating, they [did] not rise to the level of being so difficult or unpleasant that a reasonable person in [the plaintiff's] position would have felt compelled to resign." *Id.* at 1050. As with the offensive comments in *Boeing*, any suggestion that Plaintiff have signs that rhyme or that she had selective hearing were not "ongoing occurrences" or "aggravating circumstances" that would have forced a reasonable person to quit.

Plaintiff further complains that she was forced to resign due to the poor work evaluations she received and complaints that she spent too much time on personal calls. A reasonable person in Plaintiff's shoes would not have felt forced to resign because of such allegations. Rather, a reasonable person would have either remedied any deficiencies in her performance or worked with management to account for them.

Most probative of the lack of an "intolerable" working environment was Defendant's expressed desire to learn what it would take to keep the Plaintiff as an employee, including an offer to transfer Plaintiff to a nearby branch. (Pl.'s Decl. 6; Rivily Dep. 97.) In such a context, no reasonable person could have concluded that their employer was forcing them to resign.

Thus, Plaintiff cannot demonstrate that she was constructively discharged. Accordingly, any other deficiencies in her ability to establish a *prima facie* disparate treatment claim need not be addressed by this Court.

### C. WRONGFUL DISCHARGE

Plaintiff sued Defendant for the tort of wrongful constructive discharge under Washington law. As previously discussed, Plaintiff was not constructively discharged and thus this claim fails as well.

Even if she was constructively discharged, Plaintiff would be unable to demonstrate the "jeopardy" element of this tort. The tort is only actionable where other means of promoting the public

ORDER – 9

policy—in this case, preventing employment discrimination based on disability—are inadequate. *Korslund v. Dyncorp Tri-Cities Services, Inc.*, 125 P.3d 119, 126 (Wash. 2005). Yet, Washington law clearly provides another means to remedy violations based on an employee's disability. *See* Wash. Rev. Code § 49.60.

### D. BREACH OF CONTRACT

Plaintiff alleges breach of her at-will employment contract. Though Plaintiff alleges that the Defendant violated the "well recognized principle that there is in *every* contract an implied duty of good faith and fair dealing" (Pl.'s Opp'n 19) (emphasis in original), such is not an accurate statement of Washington employment law, which does not police at-will employment contracts for bad faith. *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1086 (Wash. 1984) ("[T]o imply into each employment contract a duty to terminate in good faith would . . . subject each discharge to judicial incursions into the amorphous concept of bad faith.").

Washington law does, however, provide that at-will employment contracts may be contractually modified by an employer's publicized policies, provided that all the prerequisites of contract modification are met. *Id.* at 1087. Plaintiff contends that Defendant provided her with policy manuals that said she would not be discriminated against on the basis of her disability. Plaintiff does not identify what specific treatment Defendant's policy promised her but rather alleges that it generally made assurances "against discrimination on the basis of and [sic] disability." (Pl.'s Opp'n 19.) Assuming that any such modification to her at-will employment agreement was made, her breach of contract claim thus collapses down to a claim that she was discriminated against.

This Court sees no reason to construe any such policy of nondiscrimination as setting any different standards over and above those required by Washington's antidiscrimination law. As this Court has already concluded that Plaintiff was not discriminated against for the reasons stated above, her contract claim based on Defendant employer's breach of contractually enshrined policy of nondiscrimination must likewise fail.

ORDER – 10

### E.    NEGLIGENCE

Plaintiff alleges that Defendant was negligent in hiring or retaining employees who were discriminating against her. Even if she were able to prove damages, negligent supervision claims require a showing that Defendant knew or should have known about the bad tendencies of a particular employee. *Niece v. Elmview*, 929 P.2d 420, 427-28 (Wash. 1997). Plaintiff has not alleged any facts which would support a finding that Defendant had such notice. Plaintiff never complained to human resources regarding any alleged discrimination, nor otherwise filed any complaint. Further, Plaintiff has not alleged that Defendant's employees had previously acted in a manner that should have put it on notice that its employees were likely to inflict any sort of injury. Accordingly, Plaintiff cannot sustain a claim of negligence.

### F.    OUTRAGE

The elements of the tort of outrage are "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Kirby v. City of Tacoma*, 98 P.3d 827, 837 (Wash. App. Div. 2004). The conduct must be "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Nothing alleged by Plaintiff comes anywhere close to meeting this standard. Comments regarding "selective hearing" and the refusal to construct a sign for customers of Plaintiff's disability simply do not rise to the level of outrageous conduct. Further, Plaintiff failed to allege facts demonstrating that she actually experienced severe emotional distress. Thus, Plaintiff's claim of outrage likewise fails.

//

//

//

//

//

ORDER – 11

IV.	**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is hereby GRANTED in it's entirety.

SO ORDERED this 10th day of October, 2006.

*[signature: John C. Coughenour]*

John C. Coughenour

United States District Judge

ORDER – 12